```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
OPPENHEIMER & CO., INC.,                                          :
                                                                  :
                            Plaintiff,                            :   12 Civ. 4726 (JMF)
                                                                  :
              -v-                                                 :   OPINION AND ORDER
                                                                  :
TRANS ENERGY, INC. and AMERICAN SHALE                             :
DEVELOPMENT, INC.,                                                :
                                                                  :
                            Defendants.                           :
                                                                  :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/23/2013

JESSE M. FURMAN, United States District Judge:

Plaintiff Oppenheimer & Co. Inc. ("Oppenheimer") brings this action against Trans Energy Inc. ("Trans Energy") and its wholly-owned subsidiary, American Shale Development Inc. ("American Shale"), alleging two claims for breach of contract. Specifically, Oppenheimer alleges that Defendants failed to properly compensate Oppenheimer pursuant to the terms of an agreement (the "Agreement" or the "contract") under which Oppenheimer agreed to assist Trans Energy in securing capital to finance its drilling operations. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of the Complaint in its entirety. Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

On a motion to dismiss, a court may consider facts stated in the complaint, any documents attached to the complaint, and any documents incorporated by reference into the complaint. *See, e.g.*, *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). Where the claim is for breach of contract, as here, the complaint is deemed to incorporate the alleged contract by reference because the alleged contract is integral to the claim. *See, e.g.*,

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  Accordingly, the following facts are taken from the Complaint and from documents referenced therein, including the contract, and are assumed to be true for purposes of this motion.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

**A.  The Agreement Between Oppenheimer and Defendants**

Trans Energy is an independent energy exploration and development company.  (Compl. ¶ 11).[1]  On June 18, 2010, Trans Energy entered into a letter agreement with Oppenheimer, under which Oppenheimer agreed to assist Trans Energy in raising capital to fund Trans Energy's drilling operations and meet its other financial obligations.  After the expiration of the June 18, 2010 Agreement, Trans Energy and Oppenheimer entered into a second letter agreement on July 22, 2011, under which Trans Energy once again engaged Oppenheimer "on an exclusive basis as its financial advisor, investment banker, placement agent and/or arranger with respect to one or more possible Sale(s) and/or Financing(s) . . . and with respect to such other financial matters as to which [Trans Energy] and [Oppenheimer] may agree in writing during the term of this engagement."  (Compl. ¶ 21 & Ex. A ("Agreement") at 1).  The Agreement defined the "Company" to include "affiliates of [Trans Energy] and any entity that [Trans Energy] or its affiliates may form or invest in to consummate a Transaction . . . and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of [Trans Energy]."  (*Id.*).

---

[1]  "Complaint" and "Compl." refer to the First Amended Complaint.  (Docket No. 13).

Pursuant to Section (d) of the "Compensation" provision of the Agreement ("Section (d)"), the parties agreed that if the Company consummated a qualifying financial transaction during the term of Oppenheimer's engagement, the Company would pay Oppenheimer:

(i) 1.25% of the aggregate gross proceeds of (or in the case of a revolving credit or multi draw term loan facility, 1.25% of the aggregate committed amount in connection with) any new senior secured indebtedness ("Senior Debt") issued, and 3.0% of the aggregate gross proceeds (or committed amount) of any new indebtedness ranked junior to any Senior Debt; and

(ii) 3.0% of the gross proceeds of any convertible debt or equity linked securities or obligations issued; and

(iii) 6.0% of the gross proceeds of any equity securities or obligations issued; and

(iv) with respect to any other securities or indebtedness issued, such placement fees or other compensation as shall be customary under the circumstances and mutually agreed in good faith by the Company and Oppenheimer.

(Agreement at 5). In other words, Section (d) of the Agreement set forth a schedule of fees based on the type of financing, if any, the Company obtained.

**B. The Chambers Financing**

According to the Complaint, between September and December 2011, Oppenheimer contacted twenty prospective lenders and eighteen investors on Trans Energy's behalf. Only one company, Chambers Energy Management, LP ("Chambers"), expressed interest in entering into a financial transaction with Trans Energy. (Compl. ¶ 21). Prior to committing to any financing, Chambers required Trans Energy to implement a number of structural changes at the company. Specifically, Chambers insisted that Trans Energy create a separate borrower to insulate assets and minimize Chambers's exposure to lending risks, and required that the founders and certain members of Trans Energy's management team resign. (*Id.* ¶ 22). In accordance with these

requirements, on or about February 22, 2012, Trans Energy incorporated American Shale, a wholly-owned subsidiary. (*Id.* ¶ 26).

The terms of the Chambers transaction (the "Chambers Financing") were set forth in a Credit Agreement dated February 29, 2012 (the "Credit Agreement"), among American Shale, as borrower; several banks and other financial institutions, as lenders; and Chambers, as administrative agent. Under Section 2.1(a) of the Credit Agreement, the lenders agreed to make a term loan to American Shale "in an aggregate principal amount equal to $50,000,000," contingent on the fulfillment of various conditions enumerated in Section 4.2 of the Credit Agreement. (Credit Agreement §§ 2.1, 4.2). Specifically, under Section 4.2(g), the parties were required to execute a Guaranty and Security Agreement ("GSA"), pursuant to which Trans Energy, American Shale, and Trans Energy's wholly-owned subsidiary Prima Oil Company, Inc. assigned to Chambers "a lien on and security interest in, all of its right, title and interest in, to and under the Collateral." (Corp Decl. Ex. 3 (GSA) § 3.2).[2] This assignment was made "as collateral security for the full, prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of such Grantor's Obligations." (*Id.*). Section 4.3 of the GSA further provided that these security interests would "constitute valid perfected security interests in all of the Collateral in favor of the Agent, for the ratable benefit of the Secured Parties . . . [and] are prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens." (*Id.* § 4.3).

---

[2]   Section 3.2 provides in full: "<u>Grant of Security Interest in Collateral</u>. Each Grantor, as collateral security for the full, prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of such Grantor's Obligations, hereby collaterally assigns, mortgages, pledges and hypothecates to the Agent for the benefit of the Secured Parties, and grants to the Agent for the benefit of the Secured Parties, a lien on and security interest in, all of its right, title and interest in, to and under the Collateral." (GSA § 3.2).

In addition, Section 4.2(*l*) of the Credit Agreement required American Shale to issue warrants to the lenders to purchase 19.5% of American Shale's common stock. (Compl. ¶ 3; Credit Agreement § 4.2(*l*)). The "Form of Warrant" — which is attached as an exhibit to the Credit Agreement — provided that, in the event of a default under the Credit Agreement, the holders of the warrants could force American Shale to repurchase the warrants at a price determined by an independent third party (the "cash-out option"). (Compl. ¶ 23 & Ex. B § 14.1).

On April 26, 2012, American Shale consummated the Chambers Financing, pursuant to which it received loans in the nominal amount of $50 million. (*Id.* ¶¶ 3, 34). On the same day, American Shale issued the lenders warrants for the purchase of 19,500 shares of its common stock. (*Id.* ¶ 3 & Ex. B).

## C. The Fee Dispute

Prior to consummation of the Chambers Financing, Oppenheimer and Trans Energy exchanged a number of communications regarding the specific placement fee Oppenheimer was entitled to under the contract. Specifically, on February 6, 2012, Steven Gilbertson, an Oppenheimer investment banker, sent Trans Energy's President John G. Corp an e-mail and invoice detailing the fees Trans Energy owed to Oppenheimer, including a proposed reduced fee of $1.15 million, which would be due upon the consummation of the Chambers Financing. (*See* Compl. ¶ 25 & Ex. C). Oppenheimer alleges that, although it was entitled to 3% of the $50 million loan under the contract, "in an effort to promote a good business relationship and to secure future business, [Oppenheimer] offered [Trans Energy] a fee discount based upon a blended percentage rate: 1.25% of the first $20 million of the Chambers Financing and 3.0% of the remaining $30 million of the Chambers Financing, a total of $1,150,000.00." (*Id.* ¶ 25). On March 26, 2012, Gilbertson sent an additional e-mail to Corp requesting information regarding

5

the "timing of payment of the invoiced fees," to which Corp responded: "We plan to pay all these invoices at the closing which should be April 17th-19th." (*Id.* ¶¶ 25-26 & Ex. F).

These communications continued in April and May 2012, during which time the parties' conflict regarding the appropriate placement fee emerged. For example, on April 20, 2012, Trans Energy's Chief Financial Officer sent Oppenheimer an e-mail stating that its files reflected that Trans Energy owed Oppenheimer a fee of $625,000.00, representing 1.25% of the $50 million loan. (Compl. ¶ 31 & Ex. H). On April 25, 2012, the day before the transaction closed, R. Wade Dougherty, senior counsel of Oppenheimer's investment banking group, wrote to Corp, reiterating that Trans Energy owed Oppenheimer $1.5 million (representing a 3% fee), and that failure to pay that amount would constitute a material breach of the contract. (*Id.* ¶ 33 & Ex. J). On April 27, 2012, the day after the Chambers Financing closed, Chambers wired Oppenheimer $625,000 on behalf of Trans Energy. (*Id.* ¶ 4 & Ex. K). Oppenheimer's Deputy General Counsel John McGuire wrote to Corp the same day, stating that this amount represented a deficiency of $875,040.77, and requesting immediate payment of the deficient amount. (*Id.* Ex. K).[3] On May 30, 2012, Oppenheimer reiterated this demand. (*Id.* Ex. L).

**D. The Complaint**

Oppenheimer filed the Amended Complaint on September 17, 2012. As noted, it includes two claims for breach of contract. In the first cause of action, Oppenheimer alleges that the $50 million loan that it secured for Trans Energy through the Chambers Financing was an "equity linked . . . obligation" within the meaning of Section (d)(ii) of the contract and that

---

[3]     Although Plaintiff alleges that Trans Energy made a "partial payment" of $625,000 on May 1, 2012 (Compl. ¶ 4), the e-mail from McGuire to Corp reflects that the payment was actually sent on April 27, 2012 (*id.* Ex. K). This discrepancy is immaterial for present purposes.

Defendants were therefore obligated to pay Oppenheimer a placement fee of 3% of the gross proceeds of the transaction. (Compl. ¶¶ 38-44). In its second cause of action, Oppenheimer asserts that even if the loan was not an "equity linked . . . obligation," it was a kind of security or indebtedness not specifically provided for under the contract, and that Section (d)(iv) of the contract therefore required the parties to negotiate in good faith to determine an appropriate placement fee. (*Id.* ¶¶ 45-51 & Ex. A).

## DISCUSSION

**A. Applicable Law**

Defendants move to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6). In reviewing a motion to dismiss a breach of contract claim pursuant to Rule 12(b)(6), the Court may interpret a contract properly before it, but it must resolve all ambiguities in the contract in the plaintiff's favor. *See, e.g.*, *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328-29 (S.D.N.Y. 2010). "While this standard of review favors the plaintiff, it is not so liberal that a 'threadbare' recital of the elements of a claim, 'supported by mere conclusory statements,' can suffice to defeat a motion to dismiss." *Interpharm, Inc. v. Wells Fargo Bank*, 655 F.3d 136, 141 (2d Cir. 2011) (quoting *Mortimer Off Shore Servs. v. Fed. Republic of Germany*, 615 F.3d 97, 114 (2d Cir. 2010)). To the contrary, a complaint must contain enough "factual content" to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[4] Further, a court is "not constrained to

---

[4] In Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, it relies on a now defunct standard for a motion under Rule 12(b)(6) — namely, that "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (discussing *Conley v. Gibson*, 355 U.S. 41, 45 (1957)). The

accept the allegations of the complaint in respect of the construction of the [a]greement." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Instead, where, as here, certain contracts are integral to the complaint, a court may consider those documents when assessing the merits of the motion to dismiss. *See, e.g.*, *Interpharm*, 655 F.3d at 141.

To establish a breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted). A written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, No. 11 Civ. 6053 (KBF), 2012 WL 1995089, at *11 (S.D.N.Y. June 5, 2012) (internal quotation marks omitted). In a dispute over the meaning of a contract, the threshold question is whether the contract terms are ambiguous, *see, e.g.*, *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which is a question of law for the Court to decide on a claim-by-claim basis, *see, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005); *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004). A contract is unambiguous when it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

---

Supreme Court "explicitly rejected" this "no set of facts" standard in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008).

By contrast, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (internal quotation marks omitted). Ambiguity "can arise either from the language itself or from inferences that can be drawn from th[e] language." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998). The language of a contract, however, "is not made ambiguous simply because the parties urge different interpretations." *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Further, a court must avoid any interpretation that would be "'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440 (PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (quoting *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 561 (App. Div. 1st Dep't 2003)).

Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008); *see also, e.g.*, *Rounds v. Beacon Assoc. Mgmt. Corp.*, No. 09 Civ. 6910 (LBS), 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss." (internal quotation marks omitted)). But

"when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal" on a Rule 12(b)(6) motion. *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (internal quotation marks omitted); *accord, e.g.*, *Bayerische*, 692 F.3d at 55 (explaining that "where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and in the context of a motion to dismiss, if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim" (internal quotation marks and citations omitted)).

**B.  Count One: Whether the Chambers Financing Was an "Equity Linked Obligation"**

As noted, Plaintiff's first claim asserts that the Chambers Financing was an "equity linked . . . obligation" within the meaning of Section (d)(ii) of the Agreement, entitling it to a 3% fee (or $1.5 million, plus $40.77 in other expenses). Defendants move to dismiss the claim on the ground that the Chambers Financing was "straightforward senior debt" within the meaning of Section (d)(i) — thereby entitling Oppenheimer to a 1.25% fee (or $625,000) — not an "equity linked . . . obligation." (Mem. in Supp. Mot. Dismiss 2-3). Citing the *Oxford English Dictionary* and other sources, Defendants argue that the phrase "equity linked . . . obligation" refers to a loan that is linked to, or correlated with, the *performance* of an equity security — for example, "a promissory note whose interest payable at maturity is determined by the percentage increase or decrease in the market value of the issuer's common stock over the term of the note." (Mem. in Supp. Mot. Dismiss 13 & n.4 (citing *Oxford English Dictionary* (2d ed. 1989)).

Although this interpretation of "equity linked" is certainly plausible — and may even be probable — it is not the *only* plausible interpretation of the phrase. The phrase is not defined in the Agreement and the parties have not pointed to any published decision by any court

10

construing a similar phrase in the context of a commercial contract. And while Defendants cite sources in support of their interpretation, Plaintiff has put forward other sources indicating that "equity-linked financing transactions" may include "debt instruments with detachable warrants," such as those issued here. (Mem. of Law in Opp'n Mot. Dismiss 14 (quoting Tammy Whitehouse, *Big 4 Guide Explains Equity-Linked Instrument Rules*, Compliance Week (July 14, 2011), http://www.complianceweek.com/big-4-guide-explains-equity-linked-instrument-rules/article/207433/ (last visited May 22, 2013)). *See also* PricewaterhouseCoopers, *Dateline, A look at current financial reporting issues, Accounting for certain equity-linked financing transactions*, No. 2011-25 (July 7, 2011), http://media.complianceweek.com/documents/25/dataline_2011-25%5B1%5D_6215.pdf (last visited May 22, 2013) ("Equity-linked transactions can take many forms, may be highly complex, and may involve various security offerings and enhancements that benefit the company or attract investors. Examples include: Debt instruments with detachable warrants for preferred/common equity instruments . . . .").

Looking to the contract as a whole does not resolve the ambiguity. The parties agree that issuance of the warrants was a condition precedent to the loan. (Mem. of Law in Supp. Mot. Dismiss 6, 15; Mem. of Law in Opp'n Mot. Dismiss 3-4). The parties disagree, however, on the import of this fact. Defendants argue that the issuance of the warrants was "simply one among a number of 'conditions precedent' . . . that the Lenders required American Shale to fulfill 'on or prior to the Funding Date.'" (Mem. of Law in Supp. Mot. Dismiss 15). By contrast, Plaintiff asserts that because "there never would have been any obligation at all but for the Warrants," there is a "link" between the warrants (*i.e.*, equity instruments) and the loan (*i.e.*, the obligation). (Mem. of Law in Opp'n Mot. Dismiss 13). Although the Court is inclined to think that Defendants have the better of this argument, the contract does not unambiguously foreclose

11

Plaintiff's interpretation. Similarly, while there is force to Defendants' contention that the "underlying logic" of Section (d) is that "the fee payable to Oppenheimer increases as the liquidation priority and restrictiveness of the obligation incurred decreases" (Mem. of Law in Supp. Mot. Dismiss 15), that underlying logic is not so strong as to mandate Defendants' interpretation of the relevant phrase.

Defendants further argue that because under the Credit Agreement, the lenders are free to assign their interests in the loan separate and apart from any interest they may have in the warrants, and because the holders of the warrants are similarly unencumbered in their assignment rights, the loan and the warrants are not "linked." (Mem. of Law in Supp. Mot. Dismiss 7; *see also* Credit Agreement § 9.7(b) (providing that that the lenders "may, without the consent of Borrower or any other Person, in accordance with applicable law, sell to one or more banks, financial institutions or other entities . . . [their] participating interests in [the loans].")). But, as Plaintiff argues, the warrants "were tied, among other things, to the performance of the indebtedness issued as part of this financing package" (Mem. of Law in Opp'n Mot. Dismiss 7-8), as the warrant holders' cash-out options are conditioned in part on a default under the terms of the Credit Agreement. (*See* Compl. ¶ 23 & Ex. B § 14.1). It may be that the "return or value" of the warrants is not "dependent on the performance" of the debt, but this connection between the warrants and debt could be considered a "link" between the two within the meaning of Section (d)(ii). At a minimum, it presents an ambiguity that cannot be resolved on the pleadings.

In short, at this stage of the case, the Court cannot say as a matter of law whether the loan was an "equity linked . . . obligation" under the parties' contract because the phrase "equity linked" is ambiguous. *See, e.g.*, *Eternity Global*, 375 F.3d at 178 ("[A] claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."). The phrase is

ambiguous because it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). Additional evidence regarding the parties' intent during contract negotiations, and perhaps evidence of the "customs, practices, usages and terminology" of the financial industry, are necessary to resolve the ambiguity. *Advanced Mkg. Grp.*, 300 F. App'x at 49 (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003)).

## C. Count Two: Whether the Parties Were Required to Negotiate in Good Faith

In Count Two, Plaintiff alleges that Defendants breached their obligations under Section (d)(iv) of the contract, which provides that "with respect to any other securities or indebtedness issued, such placement fees or other compensation as shall be customary under the circumstances and mutually agreed in good faith by the Company and Oppenheimer." (Compl. ¶¶ 47, 49). By its terms, however, this provision applies only if the Chambers Financing does not constitute "senior secured indebtedness" (i.e., "senior debt"), "indebtedness ranked junior to any Senior Debt," "convertible debt or equity linked securities or obligations," or "equity securities or obligations" under Sections (d)(i-iii) of the contract. Plaintiff argues that the Chambers Financing was "not a traditional senior secured debt" under the contract because it "required a high interest rate, a corporate reorganization, and issuance of the Warrant." (*Id.* ¶ 49). Accordingly, Plaintiff asserts, Trans Energy was required to negotiate in good faith with Oppenheimer to determine the appropriate fee owed to Oppenheimer. Its failure to do so, Plaintiff argues, constitutes a breach of contract. (*Id.* ¶¶ 45-51).

Plaintiff's argument is contradicted by the plain language of the contract. "Senior debt" is "[d]ebt that has priority of claim ahead of other obligations." *Barron's Dictionary of Finance*

13

*and Investment Terms* (8th ed. 2010) (explaining that "[a] lender holding perfected security interest has a claim against the borrower's assets that has priority over subsequent lien holders"). Here, the GSA clearly and unambiguously defines the debt at issue as just that: "valid perfected security interests in all of the Collateral in favor of the Agent" that "are *prior to all other Liens on the Collateral*." (GSA § 4.3 (emphasis added)). Plaintiff's argument to the contrary — that the loan was not senior debt because the transaction was complex and the debt was issued at a high interest rate (*see* Mem. of Law in Opp'n Mot. Dismiss 3 n.2) — is unpersuasive. As the Second Circuit has explained, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." *Seiden Assocs.*, 959 F.2d at 428 (internal quotation marks omitted).

As noted above, the Chambers Financing may be "equity linked" within the meaning of Section (d)(ii) of the contract. Whether or not it was, however, it was clearly "senior debt" under Section d(i), as the contractual language clearly provides that it was secured by priority liens. Either way, Defendants had no obligation under Section (d)(iv) to negotiate Oppenheimer's fee in "good faith," and Plaintiff's second breach of claim fails as a matter of law.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is DENIED with respect to Count One and GRANTED with respect to Count Two, which is dismissed.

The Clerk of Court is directed to terminate the motion. (Docket No. 14).

SO ORDERED.

Dated:  May 23, 2013
       New York, New York

                                        JESSE M. FURMAN
                                        United States District Judge